## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :

        **Case No. 05 0244 (RMU)**

      v.                :

ANTHONY KOONCE        :

### SENTENCING MEMORANDUM

Defendant Anthony Koonce, by and through counsel, Christopher M. Davis, respectfully submits the following memorandum for this Honorable Court's consideration at the time of sentencing.[1]

### Background

1.  On February 2, 2006, Anthony Koonce entered a plea to a two count information charging him with Unlawful Possession with Intent to Distribute (PWID) Heroin and Cocaine Base.  Pursuant to the terms of his written plea agreement, 18 grams of cocaine base and 11 grams of heroin were the quantities to which the parities stipulated.

2.  Anthony Koonce's plea was the culmination of extensive plea negotiations with the United States, beginning March of 2005 - when the case was initially papered in the Superior Court for the District of Columbia.[2]  As a consequence of the plea, the United States has agreed to dismiss the federal indictment and withdraw the enhancement notice that was filed several months earlier.

---

[1]Undersigned would like to credit the attorneys in *United States v. Anthony Lewis*, Crim. No. 04-430 (PLF) and *United States v. Dale Smith*, Crim. No. 02-132 (RMU) for many of the arguments outlined in this memorandum.

[2]Had the defendant's matter remained in the Superior Court, his Superior Court guideline range would have been well *below* 5 years.

3.  Sentencing issues include whether Mr. Koonce should be sentenced as a career offender as a consequence of a 1995 escape conviction, whether he should be granted a departure for over representation of his criminal history category, whether he should be sentenced outside the advisory guidelines pursuant to 18 U.S.C. § 3553(a) and finally, whether he should be sentenced to the range that would be applicable to powder cocaine as opposed to cocaine base.

4.  Additionally, there are several minor corrections that need to be addressed with respect to the defendant's criminal record.  Initially, the PSR did not classify the defendant as a career offender and when counsel met with the defendant, no discrepancies were noted. However, having been classified as a career offender, the defendant has brought several minor criminal history matters to counsel's attention.

**Presentence Report Comments**

5.  Paragraph 27, at page 6, outlines an arrest for a prior ADW charge the defendant had as a juvenile.  The defendant was adjudicated delinquent, however, the adjudication was for simple assault, not ADW.

6.  Paragraph 32, at page 8, outlines the facts underlying an Escape conviction incurred by the defendant in F 8245-95.  The PSR states that the defendant walked away from a facility in Lorton, Virginia.  This is not accurate.  The defendant was transferred from *minimum custody* in Lorton, Virginia, to a *halfway house*, Community Correctional Center #1 (CCC#1) in Washington, DC on January 20, 1995.  (See Exhibit 1).  The affidavit in the court jacket indicates that on January 29, 1995, the defendant left the halfway house without permission. (Exhibit 2).  This is not accurate either.  Mrs.

Perkins from the DC Department of Corrections (DC Jail 673-8257) confirmed that the

defendant was transferred to the Office of Rehabilitation (code 39) on January 23,

1995.  On January 29, 1995, the Office of Rehabilitation put the defendant on escape

status.   The defendant reports that he was on electronic monitoring at the time.  He

suffered a relapse (drugs) and cut off his monitoring device.

7.  Paragraph 35, at page 8, outlines juvenile charges related to auto theft.

However, the defendant does not recall ever being charged in Maryland.   Counsel has

consulted the computerized docket in this matter and has determined that defendant's

name and birth are associated with this respondent.  However, the listed guardian is not

his mother nor is it someone that either the defendant or his family recognize.  The

address associated with this case is not his mother's address, though it is an address

associated with one of the defendant's aunts.  Counsel was informed that the records

have been destroyed.

8.  Paragraph 37, at page 9, details an arrest for battery on 9/26/90.   The

defendant was never arrested for this offense.   Consultation with the court clerk

established that the case was in the District Court, not the Circuit Court.   It was also

established that a complaining witness swore out a warrant on the defendant, but the

warrant was never executed.   The warrant expired after a 3 year period and was never

renewed.

9.  Paragraph 38, at page 9, documents an arrest on 7/7/91 for a handgun

offense (M7212-91).  The charge was subsequently no papered the following day.

Then Paragraph 46, at page10, documents an arrest on 7/7/91 for a handgun offense

(no case number provided).  No disposition is noted.  This apparently is one arrest that

has been reported twice in the PSR.

## Guidelines

**Erroneous Career Offender Classification**

10.  The revised PSR has classified Mr. Koonce as a career offender.[3]   The probation department found two qualifying felonies: a 1992 Youth Rehabilitation Act Attempted Possession with Intent to Distribute Cocaine conviction (probation revoked in 1993) and a 1995 Escape conviction (incurred while serving the sentence for the first qualifying felony).

11.  As a career offender, the defendant's guideline range is 151 to 188 months. This range is based upon a sentence for 18 grams of cocaine base (inclusive of packaging materials) and 11 grams of heroin.   Absent a career offender classification, the defendant would have a criminal history category of III, which with a calculated offense category of 26, would result in a guideline range of 57 to 71 months.[4]

12.  Defendant is mindful of this Court's initial ruling in *United States v. Dale Smith*, Crim. No. 02-132 (RMU) and the fact that the DC Circuit upheld the Court's ruling that  "prison breach and escape, as prior convictions, belong to a category of

---

[3]The defense submitted no objections to the first PSR disclosed.    The first PSR did not classify the defendant as a career offender.  When the revised PSR was disclosed, the defense lack of  objection was noted  in the revised report, at page 19.  This is misleading in that the lack of objection was to the first PSR, not the revised PSR which now classifies the defendant as a career offender.  The defendant objects to the use of this prior escape conviction as a qualifying predicate to a career offender classification.

[4]As stated in footnote two, *supra*., had the defendant's case remained in Superior Court, his guideline range would have been less than 60 months.

offenses that present a serious potential risk of physical injury." [5]    However, the ruling

in *Smith* was vacated by the Supreme Court in *Thomas v. United States*, 543 U.S. 1111

(2005) and the cases  were ultimately remanded to the district court.[6]   Since the

Circuit's ruling in *Smith* has been vacated, the defendant argues that the underlying

facts of his escape conviction clearly demonstrate that this particular escape does not

qualify as a predicate for a career offender classification.

14.  In deciding this same issue, the ninth circuit has recently ruled that not all

escapes are categorically crimes of violence:

> Thus, convictions for walkaway escape could clearly take
> place on the basis of conduct that did not present a serious
> potential risk of physical injury to another.
>
> We conclude ....that a walkaway escape is not a crime of
> violence.

*United States v. Piccolo*, 441 F.3d 1084, 1088 (9th Cir. 2006).   In that case, the ninth

circuit cited an earlier holding made by another panel of the D.C. Circuit which, in *dicta*,

expressed "reluctance about extending § 4B1.2(a)[7] to an offense that could include a

---

[5]*United States v. Thomas*, 361 F.3d 653 (D.C. Cir. 2004), ruling that escape is, in all cases, a "crime of violence" under the sentencing guidelines.

[6]On March 16, 2004, the Court of Appeals affirmed this Court's escape ruling, but finding error in the consideration of Mr. Smith's arrest record in evaluating over-representation of criminal history category, remanded the case for re-sentencing.  See, *U.S. v. Thomas, supra*. Prior to re-sentencing, on January 12, 2005, the  Supreme Court vacated the judgement and remanded the case (along with two other cases that had been consolidated with it) to the D.C. Circuit for further consideration in light of *United States v. Booker*, 125 S.Ct. 738 (2005).  The D.C. Circuit subsequently remanded the record to the District Court where this Court ultimately concluded that a sentence in a non career offender range was appropriate.

[7] §4B1.2(a) is the United States Sentencing Guidelines (USSG)section that defines the term "crime of violence" as it is used in Section §4B1.1(a), the USSG section that defines the career offender classification.

"walkaway" escape, stating that "[a]rguably, the approach taken by the other circuits proves too much." [8]  *United States v. Piccolo,* 441 F.3d at 1089.  The definition of "crime of violence" was designed to "encompass truly serious crimes," *United States v. Mathis,* 963 F.2d 399, 407 (D.C. Cir. 1992) (discussing parallel "violent felony" definition) – and for the most part it does.

15.  Mr. Koonce's case is even further removed from the walk away from the half way house scenario.  He merely cut off his monitoring bracelet and basically fell out of electronic touch with those charged with monitoring his whereabouts.  At the time he did this, he was not confined to a penal institution or facility, rather, he was living at home.

16.  The defense would urge this Court to rule that Anthony Koonce's 1995 Escape conviction does not qualify him for career offender treatment.

**Criminal History Over-represented**

17.  A career offender's criminal history category is always a level VI.  USSG § 4B1.1(b).  The Guidelines authorize a downward departure in circumstances where the defendant's criminal history substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.  USSG § 4A1.3(b)(1).  The defense requests that this Court depart one criminal history category pursuant to USSG § 4A1.3(b)(1) & (3)(A).[9]  A one category reduction would result in a criminal history category V, which with an offense level of 29 would result in a guideline range of 140 - 175 months.

---

[8]*United States v. (Tourmani) Thomas*, 333 F.2d 280, 282 (D.C. Cir. 2003).

[9]In these circumstances, § 4A1.3(b)(3)(A) limits the extent of a downward departure, for career offender, to one criminal history category.

18.   Being classified a career offender as a result of cutting off an ankle bracelet while in home detention for attempting to possess with intent to distribute a street quantity of drugs substantially over-represents Koonce's criminal history.   The facts make clear that the status "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." § 4A1.3.   The drug conviction was incurred over 14 years ago, and the escape came shortly thereafter.   These two convictions account for the defendant's complete criminal history category.   The defendant was a drug abuser who evidently "came clean" after these incidents.   Equally obvious is the fact that the defendant's current problems with the criminal justice system are directly tied to what can only be characterized as a relapse into drug use following his 10 year period of abstinence.[10]

19.   Though the Court may be inclined to consider arrests when assessing whether a downward departure is warranted,[11] Koonce has a rather uneventful arrest record.   Any recent arrests - each tied to a stormy relationship[12] - resulted in a failure to prosecute.

20.   To depart under  § 4A1.3(b)(1), the Court need only find that the

_____

[10]The factual circumstances of this case, coupled with the defendant's two positive drug tests, augur well to this conclusion.

[11]The Sentencing Commission amended § 4A1.3 and though §4A1.3(a)(3) now expressly prohibits consideration of a prior arrest record for purposes of an upward departure, §4A1.3(b)(2) does not mention such a prohibition with respect to downward departures.  The defendant would nonetheless object to consideration of any prior arrests in weighing whether he is entitled to the requested departure.

[12]This relationship is described in the PSR at page 11, paragraph 51.  The defendant's contact with his prior girlfriend is, from his standpoint, limited to providing support and guidance to his children, one of whom is handicapped.

defendant's risk of recidivism is over-represented, not that it is zero.  *See, United States v. Clark,* 8 F.3d 839, 843 (D.C. Cir. 1993) (rejecting government's argument that a § 4A1.3 departure "is only appropriate when any type or degree of recidivism is unlikely" and holding that "a finding that recidivism is unlikely is not a prerequisite to a departure under a § 4A1.3").  In the final analysis, if this Court finds that escape qualifies as a predicate for career offender status, Koonce enters this class with the absolute minimum number of convictions possible.[13]  He is certainly not the type of individual congress had in mind when creating a means to remove dangerous repeat offenders from society.

### Advisory Guidelines

## Sentence Below Guidelines Warranted

21.  *United States v. Booker*, 125 S.C. 738 (2005), marked the end of twenty years of mandatory federal sentencing guidelines.  Following *Booker*, the Court is no longer required to impose a Guidelines sentence in all case, and its sentencing decision will be reviewed for reasonableness.  The core requirement of 18 U.S.C. §3553(a) is that the court impose "a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a), which provides no order of priority among the factors.

22.  The factors outlined in § 3553(a) are as follows

     *  The nature and circumstances of the of the offense and the history and

---

[13]As stated *supra,* Koonce falls into criminal history category III , in the absence of a career offender classification.  Were the Court to depart as requested, his guideline range would still be, at a minimum, in excess of 83 months beyond what it would be - absent a career offender classification.

characteristics of the defendant 18 U.S.C. § 3553(a)(1);

* the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for he offense," 18 U.S.C. § 3553(a)(2)(A);

* the need for the sentence imposed "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B);

* the need for the sentence imposed "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)©;

* the *need* for the sentence imposed "to *provide the defendant with needed* educational or vocational training, *medical care,* or other correctional treatment in the most effective manner, 18 U.S.C. § 3552(a)(2)(D);

* the kinds of available sentences available, 18 U.S.C. § 3553(a)(3);

* the guidelines in effect at the date of sentencing and any pertinent policy statements, 18 U.S.C. § 3553(a)(4) and (5);

* "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18  U.S.C. § 3553(a)(6);

* "the need to provide restitution to any victims of the offenses," 18 U.S.C. § 3553(a)(7).

23.  Although the Guidelines are no longer mandatory, a district court must still "consult the Guidelines and take them into account when sentencing. *Id.* at 767.  In *United States v. Hughes*, 401 F.3d 540, 546 (2005), the Fourth Circuit laid out the following roadmap for trial courts:

In the wake of *Booker,* therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still bound to "consult [the] Guidelines," and take them into account when sentencing," *id.* at 767. Consistent with the remedial scheme set forth in *Booker,* a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as

well as other relevant factors set forth in § 3553(a) before imposing the sentence. *See id.* at 764-65. If the court imposes a sentence outside the guideline range, it should explain its reasons for doing so. In light of the excision of [18 U.S.C.] §3742(e) by the Supreme Court, we shall affirm the sentence imposed as long as it is within the statutorily prescribed range, *see Append*, 540 U.S. at 490, and is reasonable, *see Booker,* 125 S.C. at 767.

401 F. 3d at 546-47. Other circuits, including our Court of Appeals, engage in the same analytical process. *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005); *United States v. Crosby*, 397 F.3d 103, 116 (2d Cir.2005).

24.   A district court's sentencing decision will be reviewed for reasonableness, taking into consideration the factors set forth in 18 U.S.C. § 3553(a). Pre-Booker authority supports the view that appellate courts should give considerable deference to a district court's sentencing decisions - provided the record shows that those decisions are based on a careful analysis of the factors set forth in § 3553(a) and an explanation of why those factors support the sentence imposed. *See e.g.*, *United States v. Diaz-Fillafane,* 874 F.2d 43 (1st Cir. 1989); *United States v. Mendez-Colon,* 15 F.3d 188, 191 (1st Cir. 1990); *United States v. Summers,* 893 F.2d 63, 66 (4th Cir. 1990).

**Defendant and Offense Characteristics**

25.   Under *Booker*, this Court has the authority to, and should sentence Anthony Koonce below a career offender guideline range. The nature and circumstances of the offense, coupled with the defendant's characteristics and history all augur well to imposing a sentence less than the guidelines suggest. If this Court should rule that this defendant's 11 year old escape conviction qualifies as a crime of violence, he nonetheless barely squeaks into a career offender category. As discussed in paragraphs 10-29 *supra*, his entire criminal history score is comprised of two convictions. The first conviction for a

street quantity of drugs over 14 years ago - soon followed by the second conviction - for cutting off his ankle bracelet while being monitored for the first case.  Even his sentence in the escape charge reflects the minor nature of the conduct he engaged in – he was only sentenced to 4 to 12 months.  He was  young and exercised very poor judgement.  But he should not be put into the same class as murders, robbers and rapists.  Nor does he belong in a category for large scale traffickers of narcotics.  He was simply an irresponsible abuser of drugs.

26.  In the absence of a career offender guidelines sentence, this defendant would fall into a criminal history category of III, with an offense score of 26.  His guideline range would be 57-71 months.   This range fully takes into consideration the facts of his current case and  his two prior convictions. Though the defendant has obviously relapsed into drug use again, the quantity involved is of  street level.   Imposition of a 60 month term of imprisonment would be almost three times the length of time he served during his only prior period of incarceration.  This is the statutory mandatory minimum he would have been exposed to had the United States not agreed to drop the mandatory minimum count in the indictment.  The government did agree to drop enhancement papers (which converted the 5 year mandatory into a 10 year mandatory minimum), but it is almost standard operating procedure for such enhancements to be dropped in exchange for a plea.[14]   On these facts, there can be no question that a sentence within the 57-71 month range reflects the seriousness of the offense, while at the same time, provides just punishment.

---

[14]The real issue in Anthony Koonce's case is whether it is fair and just to consider that prior escape as a qualifier for career offender.  And if it is, then to what extent should the guidelines influence this Court in imposing sentence?

**Lack of Uniformity**

27.  Uniformity in sentencing is a key objective in sentencing federal defendants. The sentencing guidelines treat all career offenders with a certain statutory maximum identically, regardless of the number or nature of their qualifying predicates.  Under a non-mandatory scheme, this Court can reasonably conclude that this one size fits all approach to "career offenders" in fact undermines the goal of uniformity set forth in § 3553(a) and the Court could deviate accordingly from the increased offense level of the career offender guidelines.  This Court has recognized its authority to take all of these factors into consideration when confronted with a  walk-away escape qualifier for a career offender classification.  *United States v. Dale Smith*, Crim. No. 02-132 (RMU) (career range 151-188 / guideline range 33-41 / sentence of 41 months).  Judge Friedman, when confronted with similar facts,  has also recognized his authority to look beyond the  blanket career offender classification.  *United States v. Anthony Lewis*, Crim. No. 04-430 (PLF) (career range 262-327 / guideline range 188-235 / sentence of 162 months).  And so has Judge Robertson, in *United States v.  Dominique Taylor*, Crim. N. 03-040 (JR) (career range 188-235 / guideline 97-121 / sentence of 97 months).[15]

28.  In its recent self-evaluation, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of

---

[15]Judge Robertson ruled that escape was not a crime of violence and sentenced the defendant to the bottom of his non-career offender range (97 months) rather than within the career offender range of 188-235 months. The government appealed and the case was ultimately remanded for re-sentencing in light of the D.C. Circuit's escape opinion in the *Thomas* case. After *Booker*, and the vacating of the D.C. Circuit's escape opinion in this case, the parties reached an agreement, approved by Judge Robertson, for a post-*Booker* sentence of 100 months.

Sentencing Reform (2004), the Commission identified the career offender provision as a sentencing rule that disproportionately impacts a "particular offender group" but serves "no clear sentencing purpose." The "particular offender group" disparately impacted by the career offender provision is African-American offenders, such as the defendant. African-American offenders constituted 26% of offenders sentenced under the guidelines in 2000, but were 58% of the offenders sentenced under the career offender provision, due mostly to the "inclusion of drug trafficking crimes in the criteria qualifying offenders for the guideline." Id. at 131-33.

**100:1 Crack/Powder Disparity**

29.    The Court should further reduce Mr. Koonce's un-enhanced 57-71 month guideline range to account for the 100:1 crack/powder disparity built into the offense level for offenses involving crack cocaine. As set forth below, the dramatic disparity between sentences for powder and crack cocaine is unwarranted. If that disparity is reduced to 20:1, as advocated by the Sentencing Commission itself, Mr. Koonce's' offense level would be a 21.[16] After reducing that offense level by 3 levels to account for acceptance of responsibility, the defendant's appropriate guideline range is **46-57 months.**

30.    The argument against imposing a sentence that incorporates the 100:1 crack/powder disparity is based primarily upon the Sentencing Commission's own

---

[16] This offense level is arrived at by: (1) multiplying the total quantity of crack in this case (18 grams of crack) by 20, which converts it to powder (360 gms powder); (2) converting the powder to marijuana (1gm:200gm ratio) 360 gms powder x 200 gms of marijuana = 72,000 gms of marijuana (72 kg of marijuana); (3) adding the 72 kg (marijuana) to 11 kg (marijuana from conversion of heroin) (1gm:1kg.ratio) = 83 kgs of marijuana. This results in an offense level of 24, taking of 3 points for acceptance = 21 and with a criminal history category of III, resulting in a guideline range of 46-57 months.

disavowal of the basis for that disparity.  The Commission has issued several reports discounting the disparity.

### 1.  The 1995 Report

31.  In February 1995, the Commission issued the first report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (Feb. 1995) ("1995 Report").  The Report repudiated the still-existing crack sentencing structure.

32.  The 1995 Report is a comprehensive study which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to make sentencing determinations and recommendations.  See 28 U.S.C. § 994.  The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine.  Many of the factors were found to provide no support for a higher penalty for crack.  Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio."  1995 Report at xiv.

33.  Analyzing information not considered at the time the existing ratio was adopted, the Commission found that the 100-to-1 penalty ratio (I) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates

extraordinary disparities given the street values of the two forms of cocaine.[17]  1995 Report at 173, Table 19.

34.  The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with specific sentence enhancements more closely tailored to the supportable harm associated with some crack cocaine offenses.  The Report states:

> The Sentencing Commission shares congressional and public concern about the harms associated with crack cocaine  - - both to users and to the society as a whole - - including the violence associated with its distribution, its use by juveniles, the involvement of women and juveniles in its distribution, and its addictive potential. However, the Sentencing Commission concludes that Congress's objectives with regard to punishing crack cocaine trafficking can be achieved more effectively without relying on the current federal sentencing scheme for crack cocaine offenses that includes the 100-to-1 quantity ratio.

1995 Report at xiv.

35.  By subsequently promulgating proposed amendments to the crack guidelines, the Commission acknowledged that it had not adequately considered factors bearing on the 100:1 sentencing disparity between crack and powder cocaine before enacting the guidelines presently in effect and in light of changes to other guidelines specifically addressing harms associated with some crack offenses.  In short, "the Commission concluded that sufficient policy bases for the current penalty differential do not exist."

36.  With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the Commission by its own admission overlooked a number of factors which are relevant to the statutorily-defined sentencing purposes.  The Commission acknowledged

---

[17]  For example, at offense level 18, the street value of cocaine base was $115.  The street value of powder cocaine at the same offense level was $10,700.  1995 Report at 173, Table 19.

this in the 1995 Report and in its submission to Congress of a guidelines amendment proposing the equalization of the crack/powder cocaine penalties. 60. Fed. Reg. 25, 074 (May 10, 1995). The Commission admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the offense and the offender" other than "the quantity and form of cocaine." 1995 Report at I. "In a given case," other characteristics "can be equally or more important" to the determination of the "appropriate punishment." Id.

37.    Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psychopharmacologically induced crime. 1995 Report at 168-175; 193-197. Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor. Id. at 193-197.

38.    The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1." 1995 Report at 197. Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics. Id. at 166. Significantly,

separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986.  "[T]o the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments.  In short, [crack cocaine defendants] are doubly punished through the interplay of the two structures." Id. at 196.  The Commission concluded that the use of enhancements based on injury to victims, violence, possession of a weapon, and the like is a "distinctly fairer" approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to distinguish among offenders warranting greater punishment . . . " Id. at 199.  The Commission acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because they punish less culpable crack dealers more severely than more culpable cocaine dealers and suppliers" and that "no policy basis for the present 100:1 sentencing differential exists".

39.  As discussed above, the Commission, shortly after issuing the 1995 report, proposed a guideline that would have equalized the amounts of crack and powder under the guidelines.  Congress voted to disapprove this amendment, but directed the Commission to further study the matter.

### 2.    The 1997 Report

40.  In April 1997, the Commission issued its second report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report").  This 1997 Report also concluded that the crack/powder sentencing disparity was unwarranted.

41.  In the 1997 Report the Commission carefully considered each factor listed in the congressional directive and evaluated current federal cocaine sentencing policy in

relation to congressional goals for drug offense sentencing.  The goals suggested that those who traffic in either powder or crack cocaine should be sentenced severely but that the current penalty differential between powder and crack cocaine sentencing must be reduced.  See 1997 Cocaine Report at 3.  The Commission concluded that the five-gram trigger for crack cocaine is "over inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or serious drug trafficker.  Id. at 5.  It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity.  See id.  at 506.  The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White.  See id. at 8.  As a result, the sentences are "harsher and more severe for racial the minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency."  Id.

42.  After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio."  1997 Cocaine Report at 9.  It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1 quantity ratio simply "cannot be justified."  Id. at 2.  In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated

-18-

with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and it addictive potential. See id. at 9. The Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because hundreds of people continue to be sentenced under an unfair law. See id. at 8-9.

### 3.    The 2002 Commission Report

43.    The Sentencing Commission recently issued a new Report to the Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report").    In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio." Id. at viii. In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based. The Commission made four main findings. First, it found the current penalties exaggerate the relative harmfulness of crack cocaine. Second, the current penalties sweep too broadly and apply most often to lower level offenders.    Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality. Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities. Id. at v-viii. The Commission proposed a model guideline amendment to remedy the problems with extensive modifications. Id. at A-1 to A-10.

44.    With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (*see* Chapters 5 and 8). This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race.    Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial disparity problematic because it fosters disrespect for and lack of

confidence in the criminal justice system.  Moreover, to the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

Id. at viii.  The Commission further stated:

One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses relates to the racial composition of federal crack cocaine offenders.  The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000.  This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.

In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required.  For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race.  On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race.  Although data regarding the racial composition of crack cocaine users are available, such data do not exist for crack cocaine traffickers generally.  As a result, this assertion cannot be evaluated scientifically.

Nevertheless, the Commission finds even the perception of racial disparity to be problematic.  Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.

* * *

The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

Furthermore, to the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for

-20-

most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

Id. at 102-103.

### 4.    The 2004 Assessment

45.  Even more recently, in its report, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform (November 2004), the Commission again criticized the harsher penalties for crack.  The Assessment again noted the stark racial impact of this disparity:

> In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.  The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug.  Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

> The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.
> . . .
> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward.    In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132.  The Assessment concluded that:

> As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months.  Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months.  This one sentencing rule contributes more to the differences in average sentences between African-

American and White offenders than any possible effect of discrimination.  Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it <u>would dramatically improve the fairness of the federal sentencing system</u>.

<u>Id</u>. (emphasis added).

### 5.    <u>Cases</u>

46.  The D.C. Circuit rejected the argument that a downward departure under the then-mandatory guidelines was permissible because of the unwarranted crack/powder sentencing disparity.  <u>See</u> <u>United States v. Anderson</u>, 82 F.3d 436 (D.C. Cir. 1996).  In <u>Anderson</u>, the defendant relied heavily upon the 1995 report to argue that such a departure was warranted.  The court in <u>Anderson</u>, however, relied primarily upon the fact that the 1995 Report was not assigned official status under 18 U.S.C. § 3553(b), and thus the 1995 Report had essentially no bearing in departure analysis under the mandatory guidelines system.  <u>Id</u>. at 440-41.

47.  Notably, however, the majority in <u>Anderson</u> declined to address an argument that the disparity violated § 3553(a)'s requirements, claiming the defendant had not raised the issue.  <u>Id</u>. at 441.  The court noted that § 3553(a) had to be read in light of the express requirements of § 3553(b).  <u>Id</u>.

In dissent in <u>Anderson</u>, Judge Wald focused on § 3553(a):

The majority's analysis is flawed because it stops short of asking the critical question: whether these cases fit into that very narrow category of circumstances where a policy statement or official commentary is <u>not</u> binding upon a sentencing court because it violates constitutional or statutory dictates.  In light of the findings in the Special Report, it seems to me that applying the atypicality requirement to deny departure authority would violate a federal statute - - the Sentencing Reform Act itself.  Section 3553(a) of the Sentencing Reform Act sets forth the factors a court must consider when sentencing under the guidelines, directing courts to impose a

-22-

sentence which is "sufficient, but not greater than necessary" to achieve the goals of sentencing.

. . .

In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes. But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish the four purposes of § 3553(a). To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision - - an interpretation which would be at odds with basic tenets of statutory construction.

. . .

The nub of the problem here, of course, is that the *Special Report* is a startlingly forthright admission by the Sentencing Commission that its crack guidelines violate § 3553(a)'s instructions that a court impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offenses" and "provide just punishment."

. . .

The[ ] acknowledgments by the Commission itself - - that crack sentences raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less culpable crack dealers far more severely than more culpable cocaine dealers and suppliers, and that no policy basis for the present 100:1 sentencing differential exists - - make it impossible to square the crack guidelines with the sentencing purposes of § 3553(a). For this reason, I believe a district court is authorized to disregard the atypicality requirement and, though it should proceed cautiously in this largely unchartered terrain, to grant a departure if it determines that application of the crack guidelines to the case it before it will, in fact, plainly violate § 3553.

Id. at 446-48 (Wald, J., dissenting).

48.  In In re Sealed Case, 292 F.3d 913 (D.C. Cir. 2002), defendant argued that the Supreme Court's decision in Koon v. United States, 518 U.S. 81 (1996), had overruled Anderson. The court, however, continued to adhere to the heartland analysis of § 3553(b), and relying upon Anderson, reaffirmed its decision that a departure for the crack/powder disparity could be imposed.

49.  The decision in Booker has eviscerated the rationale for the holdings in Anderson and In re Sealed Case. The Supreme Court in Booker excised § 3553(b)(1),

the provision upon which the majority in <u>Anderson</u> relied for its decision, and made the guidelines advisory and a factor to be considered along with all the other factors set forth in § 3553(a). Thus, Judge Wald's dissent in <u>Anderson</u> now directly addresses the issue before this court. She cogently points out how the unwarranted crack/powder disparity violates § 3553(a)'s provisions.

50. Moreover, the current basis for the disparate treatment of crack and powder sentences, unfortunately, was permeated with racial considerations, reflected in Congress's disapproval in 1995 of the Commission's amendment that would have equalized the treatment of the two substances. The rejected amendment would have abolished the 100:1 ratio between crack and powder while creating or enhancing adjustments for violence and the use of minors in connection with drug trafficking offenses.

51. The members of Congress who voted to reject the equalization of the cocaine penalties repeatedly and unanimously explained their position in terms of their desire to protect African-Americans and other minorities living in inner city neighborhoods from the harm caused by the use and distribution of crack cocaine. The record of the Congressional debate of October 18, 1995, in which the House adopted the bill rejecting the equalization amendment that had already been adopted by the Senate, prominently reflects this motivation. <u>See</u> 104 Cong. Rec. H10256-10283 (daily ed. Oct. 18, 1995).

**6.    The Smith Case**

52. Consistent with <u>Booker</u> and the above discussion, a district court very recently imposed a sentence below the recommended guidelines because of the unwarranted disparity between crack and powder. In <u>United States v. Smith</u>, 2005 WL 549057 (E.D. Wis. March 3, 2005), Judge Lynn Adelman of the Eastern District of Wisconsin dealt with

a defendant facing a ten-year mandatory minimum sentence, whose guidelines range was 121-151 months, as a result of an offense level of 31 and a criminal history category of II. The government, however, moved for a 6-level departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). This would have resulted in a guidelines range of 70-87 months, but, because the § 3553(e) motion did away with the mandatory minimum sentence, the "extent of any departure granted is within the court's discretion." Initially, Judge Adelman granted a 10-level departure for the substantial assistance.

53. Judge Adelman then thoroughly reviewed the Commissions's three reports, as well as other literature on the crack/powder disparity. She noted that the "Commission has studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported by data." She concluded, as had the Commission, that "none of the previously offered reasons for the 100:1 ratio withstand scrutiny." She reviewed the Commission's efforts to eliminate the unwarranted disparity:

> In the present case, I concluded that adherence to the guidelines would result in a sentence greater than necessary and would also create unwarranted disparity between defendants convicted of possessing powder cocaine and defendants convicted of possessing crack cocaine. The question then became what ratio to apply. Everyone seems to agree that 100:1 is too high.

54. In Smith, the drugs were found in defendant's home. There were 69.99 grams of crack and 653.19 grams of powder. The district court converted this to 1528 kilograms of marijuana, in accordance with the drug equivalency table in § 2D1.1 comment. (n.10). The crack converted to 1399.80 kilograms of marijuana, and the powder to 130.63 kilograms. Thus, the powder, which was almost ten times the quantity of crack, had no affect on the offense level. The resulting offense level was 32. There were also two

loaded handguns in a dresser, which increased the offense level by 2 under § 2D1.1(b)(1). With a three-level decrease for acceptance of responsibility, the adjusted offense level was 31.

55.   The defendant in Smith also had two prior convictions, both for possessing marijuana.  He received "short jail terms" for the prior convictions.  This put him in criminal history category II.  The resulting guidelines range was 121-151 months.  Judge Adelman, however, ultimately decided to apply the roughly 20:1 ratio that would have resulted from the 2002 Report's recommendations and proposed guidelines restructuring.  This resulted in a guidelines range of 27-33 months.   Under all the circumstances, she imposed a sentence of 18 months.

56.   For the same reasons set forth in Smith, the Court should apply the 20:1 ratio and reduce Mr. Koonce's sentence commensurately in this case.  As noted, the resulting sentencing range would be 46-57 months.  Judge Friedman recently ruled that he had the authority to sentence according to the 20:1 ratio in *United States v. Michael Anthony Brown,* Crim. No. 04-385;[18] *United States v. Robert S. Harris*, Crim. No. 03-539.  Judge Richard Roberts, as well as Judge Robertson and Judge Huvelle also use this ratio.[19]

### Conclusion

57.   Anthony Koonce did not have it easy as a child.   His father and mother

---

[18]A copy of Judge Friedman's March 7, 2006 oral opinion has not been filed electronically.  However, a transcript of his ruling has been mailed to Chambers, along with a courtesy copy of this motion.  Rachel Lieber was one of the prosecutors on brief in that case.  Consequently, counsel assumes she already has a copy.

[19]Judge Bates, Judge Collyer and Judge Kennedy sentence according to the 100:1 ratio. Judge Bates recently opined on the issue in *United States v. John Doe*, 412 F.Supp.2d 87 (D.D.C. 2006).

separated when he was three years old.   He lived with his Mom until he was five, at which time he moved in with a maternal aunt who assumed responsibility for raising him.  See PSR at page 10, paragraph 48. His Mom suffers from depression, as does he.  PSR at page 12, paragraph 54.  Despite these difficulties, he made it through the 11th grade with a grade point average of 3.75.  Though he did not finish high school, he obtained his GED and went on to the University of the District of Columbia where he studied Printing Management.  He attended  through his junior year and left the program with a 3.4 GPA. See, PSR at page 13, paragraph  61.  Mr. Koonce obtained numerous certificates for academic excellence while at UDC.  See Exhibit 3.   He obtained the highest grade point average among the freshman class.  See PSR at page 13, paragraph 61.   From April of 1999 until his arrest in this case, the defendant was employed at Charter Printing in Alexandria Virginia.  The business has since undergone a change in ownership.

58.   Mr. Koonce realizes that he is going to be incarcerated for a period of years. He is an intelligent and motivated individual. Recognizing a need for a marketable skill when he is released from prison, he has expressed a keen interest in auto mechanics.  FCI Ft. Dix and FCI Gilmore each have an 8000 hour, 4 year auto mechanics program.   The defendant would in all likelihood need to be sentenced to below the 10 year threshold to be housed in either of these facilities.  This would be another factor the defendant would request that the Court take into consideration when deciding what is a reasonable sentence in this case.

59.   Along with his desire to obtain a skill, the defendant also recognizes his need to effectively use his incarcerated years by participating in a long term intensive drug treatment program.   Clearly cocaine use is what brought this defendant into the criminal

justice system and this extended time of recovery can most effectively be used if he is in a structured long term drug treatment program.  Again, this would be another factor the defendant would  request that the Court take into consideration at the time of sentencing.

60.  Finally, the defendant would ask that this Court understand that he realizes he not only let himself down by testing positive for cocaine, but that he let the Court down after having being granted a second chance.   For this, he extends his heart felt apology and promises to focus on making himself a better and more self sufficient man.

Respectfully submitted,

**Christopher M. Davis**

Christopher M. Davis #385583
Davis & Davis
The Lincoln Building
514 10th Street, N.W. - Ninth Floor
Washington, D.C. 20004
202-234-7300

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this Motion was electronically served upon Rachel Carlson Lieber, AUSA, Room 4820, 555 Fourth Street, NW, Washington, D.C. 20530, on this 6th  day of May, 2006.

**Christopher M. Davis**

Christopher M. Davis

-28-